**Joshua and Jessica Dellis**
275 Haney Ave.
Algoma, WI 53151-2841
                    Plaintiffs,

Vs.
                                          **Case No.** 18-CV-202

**Fay Servicing, LLC**
901 S. 2nd Street, Suite 201
Springfield, IL 62704
                      Defendant.

## FIRST AMENDED COMPLAINT

Plaintiffs, Joshua and Jessica Dellis, by and through their attorneys, Lawton & Cates, S.C. and Briane F. Pagel, as and for a complaint hereby allege as follows:

1. Plaintiffs are Wisconsin citizens residing at the address shown in the caption hereto.

2. Defendant Fay Servicing LLC is upon information and belief a limited liability company with a principal place of business located at the address in the caption hereto. Upon information and belief, Fay Servicing engages in the origination of and servicing of residential mortgages.

3. The Dellises bring claims here under federal law, and thus the Court has jurisdiction over those federal question claims pursuant to 28 USC 1331; and jurisdiction over related state law claims pursuant to 28 USC 1367.

4. On May 31, 2007 the Dellises entered into a note and mortgage, borrowing $72,900 from First Funding Group LLC, and securing that debt with a lien on their primary residence.

5. On or around that same day, May 31, 2007, the note was assigned to Citi Mortgage, Inc.

1

6. In or about 2013 the Dellises had become concerned about their ability to continue paying their mortgage, as the payment was increasing due to the adjustable rate nature of their then-existing mortgage loan.

7. At or prior to that time, the loan had been transferred to Juniper Ventures, LLC, as the lender/noteholder. The loan was being serviced by CitiMortgage as of 2013.

8. The Dellises thus began the process of attempting to obtain a loan modification from their then servicer, CitiMortgage, and submitted an application for loss mitigation/loan modification.

9. In March 2013, CitiMortgage notified the Dellises that it had everything it needed to act on the modification application the Dellises had submitted.

10. By May 2013, CitiMortgage had not yet granted or denied the Dellises' application. In May 2013, CitiMortgage notified the Dellises that the servicing of their loan would be transferred to Fay Servicing.

11. According to the letter from CitiMortgage, Fay Servicing would take over the servicing on May 24, 2013.

12. By the end of May, the Dellises had not heard from Fay Servicing, and so Joshua Dellis called Fay Servicing to inquire about the status of his loan and the Dellises' loss mitigation application.

13. In May 2013, Fay Servicing claimed to the Dellises that they had no record of the Dellis loan in their system.

14. In June 2013, Joshua Dellis contacted Fay Servicing again. He was told that his "single point of contact" was Eddie Galvan. Joshua left numerous messages for Galvan over a three week period, but never heard from Galvan.

15. Instead, a woman named "Juliet" finally contacted Josh Dellis and said Galvan was no longer employed by Fay Servicing; "Juliet" said she would be the new single point of contact.

16. Juliet told Joshua that she had no paperwork on the loan modification, and questioned Joshua at length about the Dellises' financial status; at the end of that conversation Juliet said the Dellises would be a "great candidate" for modification. Joshua Dellis understood Juliet to be saying that the modification application was under consideration at that point. These calls took place in June 2013.

17. In July 2013, Juliet told Joshua that the Dellises needed to submit a payment of $581.52 to cover a payment on their account. Juliet did not say what payment this was intended to cover or how it would be applied. Nevertheless, the Dellises made this payment.

18. Juliet also in July 2013 sent a letter to the Dellises advising them of additional paperwork that was needed for their modification application. The Dellises provided that additional documentation.

19. In August 2013, Joshua Dellis attempted to make a second payment to Fay Servicing. Juliet said that Fay would not accept payments until the modification application process as completed. Joshua asked to speak to a manager about this, as he did not want the account to fall further behind. The manager, Tracy, confirmed that Fay would not accept payments while the application was pending.

20. In August 2013 a different Fay Servicing employee, Joe Guerra, called the Dellises and said he was their new single point of contact. Guerra requested that the Dellises send him several specific documents, which Joshua Dellis recognized as having already been provided to Fay.

21. Joshua Dellis told Guerra that the Dellises had provided those documents already, but Guerra claimed that he had no documents in their file and that there were no notes on the file.

22. For example, on September 15, 2013, the Dellises had emailed to Juliet banking statements for their business and personal accounts, current through July 2013. On September 25, 2013, the Dellises forwarded those documents (with the original email) to Guerra, asking that he confirm receipt and that he could open the documents; Guerra confirmed that the had received the email but said that he could not get the attachments to come through.

23. The Dellises supplied the documents again, and over the next several months called at least two times each month to check on the status of their application. The Dellises left multiple messages for Guerra in this time period.

24. A few times in that period, Guerra returned the phone calls, but in those responses, Guerra claimed that he had sent emails requesting additional documents. The Dellises had received no emails from Guerra in that period. When the Dellises informed Guerra of that, Guerra told them that Fay had been having "computer issues" at one point and claimed that might be why the Dellises had not received his emails.

25. During the phone call in which Guerra was claiming he sent emails and that Fay had "computer issues," Guerra told the Dellises what documents were needed to continue processing the loan modification.

26. Josh Dellis immediately mailed the documents requested by Guerra, using the US Post Office regular mail with sufficient postage and the correct address.

27. Many weeks after the "computer issues" phone call and Josh Dellis' mailing the documents, Guerra claimed that he had not received the documents. When Josh Dellis told Guerra they had been mailed and requested Guerra check his mailroom, Guerra said the mail room was "too big" and that he would not be able to locate them.

28. Josh Dellis accordingly re-sent the same documents using FedEx Ground, and tracked the package. When FedEx ground said the package had been delivered, Josh called Guerra to tell him that.

29. Guerra claimed at that point that he had not received the FedEx Ground delivery and he was not sure where it was delivered. Guerra said he would not try to locate the package at Fay Servicing.

30. On September 5, 2013, Juniper Ventures, LLC, through the law firm of Gray & Associates LLP, sent the Dellises a notice of acceleration, declaring the loan in default and demanding payment of $5,886.24 on or before October 5, 2013. The payment was demanded to be made to Fay Servicing; upon information and belief, Fay Servicing had retained the Gray firm and had directed Gray to send the September 5, 2013 notice of acceleration.

31. Finally, in February 2014, Fay Servicing told the Dellises that their application was complete and that the Dellises were eligible for a 'forbearance plan' that would begin in April 2014.

32. Upon information and belief, Fay Servicing did not provide the Dellises with a written notice telling them which programs they had been declined for, and did not provide the Dellises with any information on how to appeal any adverse determination Fay had made with respect to modification program eligibility.

5

33. The Dellises received the forbearance paperwork from Fay in March 2014. They signed and returned them immediately.

34. The forbearance packet allowed them to start making payments and they began making payments in April 2014. Prior to signing that document, the Dellises had not had the legal right to make partial payments on the loan since the date of acceleration of the loan.

35. In May 2014 Guerra was replaced as the 'single point of contact' by Neal Hogberg.

36. Hogberg told the Dellises that there was additional paperwork needed to come up with a permanent modification and gave them until the end of July to provide it.

37. Hogberg told the Dellises that if they got him the requested paperwork by the end of July 2014, he would be able to have a permanent modification offered before the six-month forbearance ended in October 2014.

38. In July 2014, the Dellises sent all requested documents to Hogberg.

39. When Josh Dellis called Hogberg to confirm he had received the paperwork, Hogberg said that it had "not reached his desk" but told Josh Dellis that it would take a couple of weeks.

40. During the six-month forbearance the Dellises made all required payments timely.

41. In August and September 2014, the Dellises periodically checked with Fay to see if they had all the paperwork to analyze the modification. Each time Hogberg said that they had what they needed, and everything was "being processed."

42. This continued until one day in September 2014 Hogberg told the Dellises that they needed to supply three months' worth of bank statements, for July, August and September 2014; Hogberg also asked for profit/loss statements from Josh Dellis.

43. On October 30, 2014, the Dellises emailed to Hogberg their July, August and September 2014 bank statements, Josh's profit/loss statement, and Jessica's two most recent paycheck stubs.

44. Hogberg acknowledged, in an email that same day, receipt of those documents and said they were "Received and being processed."

45. In November 2014, Fay Servicing offered to extend the Dellises' forbearance 3 months because they had not yet completed the modification review.

46. The Dellises did not agree to extend the forbearance because Fay Servicing had told them that the modification would be completed, and they would have a permanent modification before the six-month forbearance ended.

47. In January 2015, Fay Servicing sent the Dellises a brand-new application for loss mitigation.

48. On January 15, 2015, Juniper REO 2013 LLC, claiming to hold the note, served a foreclosure summons and complaint on the Dellises. Juniper's address was listed as c/o Fay Servicing, at Fay's Chicago offices. Upon information and belief, Fay directed the Gray firm to file and serve this action. This action was served on the Dellises on January 17, 2015, requiring that they file an answer in 20 days or less.

49. In February 2015, the Dellises sent, again, all requested documents and a completed loss mitigation package via certified mail. This receipt was acknowledged by letter from Fay dated February 20, 2015.

50. However, despite the fact that delivery of the modification papers was confirmed, Hogberg refused to retrieve the documents from the Fay system until the Dellises requested he do so.

7

51. Because Hogberg refused to retried the documents, in the February 20, 2015 letter acknowledging receipt of the modification packet, Fay requested that the Dellises provide them with the "Most recent federal tax return for both borrowers," but then clarified that to mean the *2013* "personal and business tax return", and Fay also said that the Dellises now needed to provide them with the October 2014 through January 2015 "P&L statements" and a "hardship explanation." Fay gave the Dellises until March 22, 2015 to provide that information. The Dellises had either already submitted that information, or submitted it by March 22, 2015.

52. Josh Dellis began to call Hogberg weekly during this time, and Hogberg became aggressive and confrontational with Dellis.

53. Hogberg, for example, would tell the Dellises that they "can't afford [their] house," and claimed that they had no record of Jessica's employment, even though multiple paystubs from Jessica's workplace had been sent.

54. By March 2015, Josh Dellis was calling Hobert twice weekly, but rarely got him on the phone and rarely had his voicemails returned.

55. On April 7, 2015, Fay sent the Dellises a letter denying the Dellises a modification and claiming that the Dellises had failed to "submit a completed "Initial Package in the timeframe requested." This was the only letter Fay sent to the Dellises from February 20, 2015 until April 7, 2015.

56. The Dellises had, as of April 7, 2015, submitted all documentation requested by Fay, some documents numerous times.

57. The Dellises did not agree that they had failed to submit documentation, and believed that they were still eligible for a modification.

8

58. On April 27, 2015, Fay Servicing emailed the Dellises asking for a copy of a "YTD P&L (Oct '14- Jan '15). Right away."

59. On April 30, 2015, the Dellises emailed to Fay Servicing a signed copy of the "YTD P&L" requested in the April 27 email.

60. The Dellises always provided all documents requested by Fay on or before the due date for providing them.

61. In May 2015, Fay Servicing sent the Dellises a letter stating that the Dellises need not submit any new documents for a loan modification as everything had been received.

62. Also in May 2015, Fay Servicing offered the Dellises a modification, seeking to modify the loan to 7% interest for 480 months, and which modification made the payments and terms more expensive than the loan had been originally.

63. The modification that Fay offered was substantially more expensive to the Dellises than was available under other programs; because Fay had erroneously and illegally denied the Dellises a loan modification on April 7, 2015, the Dellises ended up with an offer for a worse modification than they should have, and a modification offer that was not their first choice and not the modification they should have received. The Dellises did not accept this modification offer.

64. Fay also gave conflicting information about why the Dellises were denied certain modification programs. In the April 7 letter, Fay said the Dellises were not eligible for a "Making Homes Affordable" modification program because (Fay claimed) the Dellises had not submitted the initial package.

65. The April 7 letter also did not include any information about how the Dellises could appeal that determination.

66. In or around May and June, 2015, Josh Dellis called Hogberg to discuss the modification offer. Hogberg became upset and belligerent. When Josh said that they would pursue their claims in court, Hogberg said that the Dellises could not afford a lawyer and would lose their house.

67. During 2015, Fay Servicing sent billing statements to the Dellises that demanded wildly varying amounts.

    a. For example, in July 2015, Fay Servicing sent a billing statement stating that the Dellises had to pay a minimum of $17,668.36 as their amount due, and that interest was accruing on the loan at a rate of 7.8%.

    b. Then, in August 2015, Fay sent a billing statement that asserted the Dellises were required to make a minimum payment of $20,340.43, and that interest was accruing on their account at 9.550%. Between July and August 2015, only one regular monthly payment, in the amount of $847.59 had become due, so it is unclear how the payment went up by nearly $3,000 in that month .

68. The Dellises fought the foreclosure, and on November 12, 2015, the noteholder's motion for summary judgment was denied by the trial court, citing Fay Servicing's conduct.

69. On February 22, 2016, Fay solicited the Dellises yet again for a loss mitigation loan modification, sending a package for the Dellises to fill out and requesting information from them.

70. On or about March 4, 2016, the Dellises using the February 22 forms submitted yet again another packet seeking a modification of their loan, providing Fay Servicing at that time with all requested documents.

71. Fay Servicing did not respond to the March 4, 2016 packet until April 27, 2016, offering the Dellises a loan modification on a trial basis. That modification was accepted by the Dellises on May 1, 2016.

72. The new principal balance on the loan was $105,954.40; at the time the foreclosure complaint had been filed, the principal on the loan was $75,467.79, and interest had been accruing only since July 2013.

73. Because the loan had been accelerated, the Dellises had no opportunity or ability to make partial payments on the loan from the date Fay directed acceleration through the date Fay offered them a loan modification on April 27, 2016, other than the six payments allowed in the forbearance period, meaning that all interest which accrued during that time accrued as a direct result of Fay's acceleration of the loan and Fay's dilatory conduct with respect to the modification.

74. As of May 1, 2015, when Fay directed the Gray firm to move for summary judgment, the total owed in principal and interest was $86,240.89; the Dellises do not know and were never told how their loan had increased from a total owed of $86,240.89 to $105,954 between May 1, 2015 and April 27, 2016.

75. To date, the Dellises do not know why their loan increased by nearly $20,000 between May 1, 2015 and April 27, 2016, an increase that is especially confusing to them because from July 1, 2013 to April 30, 2015, only $10,773.10 in interest had accrued, so the Dellises have no idea how nearly double that amount could have accrued between May 1, 2015 and April 27, 2016.

76. The Dellises signed the April 2016 modification because they feared that they would go back into foreclosure if they did not, and did not want to risk their house any further.

## First Cause of Action:
## Violation of RESPA:

77. Reallege and incorporate the foregoing as though set forth fully at this point.

78. In and after May 2013 and continuing through the offer of a loan modification in June 2015, defendant failed to exercise reasonable diligence in the handling of loan modification applications submitted by the defendants.

79. In and after May 2013 and continuing through the offer of a loan modification in June 2015 defendant failed to promptly review the Dellises' loan modification applications, failed to notify them of the completed application in the time limits required by law, and failed to properly evaluate those applications.

80. In and after May 2013 and continuing through the offer of a loan modification in June 2015, defendant failed exercise reasonable diligence in ensuring that the loan modification was complete or seek additional documents to make the application complete.

81. Defendant failed to comply with RESPA in particular, in addition to all the foregoing, by not completing the review of the initial packet in the time allowed by law, by failing to exercise reasonable diligence in reviewing and completing the packet, by failing to provide appropriate notice of appeal rights from modification denials, by failing to act on the 2016 application in the times allowed by law.

82. As a direct and proximate result of the foregoing, the Dellises have suffered damages including but not limited to accruing of attorney's fees, late charges on the loan, damage to their credit, loss of equity in the house, loss of tax deductions from inability to pay and claim mortgage interest, increased costs of their mortgage and in particular but not limited by express enumeration the payment of significantly more interest than they

12

Case 1:18-cv-00202-WCG   Filed 06/05/18   Page 12 of 15   Document 12

would otherwise have had to pay, and emotional distress from the fear of losing their home, and pursuant to 12 USC 2605 plaintiffs are entitled to an award of actual damages and attorney's fees.

## Second Cause of Action:
## Intentional Interference With Contract:

83. Reallege and incorporate the foregoing as though set forth fully at this point.

84. There existed at all times material hereto a contract between plaintiffs and their noteholders/lenders: the original note and mortgage.

85. Defendants' actions as alleged herein interfered with the Dellises' ability to comply with those contracts.

86. Defendants' actions as alleged herein were upon information and belief intentional and not privileged or allowable.

87. As a direct and proximate result of the foregoing, the Dellises have suffered damages including but not limited to accruing of attorney's fees, late charges on the loan, damage to their credit, loss of equity in the house, loss of tax deductions from inability to pay and claim mortgage interest, and plaintiffs are entitled to an award of actual damages.

## Third Cause Of Action:
## Violation of Section 224.77, Wis. Stats.:

88. Reallege and incorporate the foregoing as though set forth fully at this point.

89. Defendants' actions as alleged herein violate section 224.77 as follows:

    a. Fay's statements with respect to the forbearance were false, deceptive and misleading promises that influenced the Dellises to their detriment, namely, the Dellises accepted the forbearance and made payments based on the promise that

13

the new modification would be offered in six months, which actions by Fay violate section 224.77(1)(c), Wis. Stats.

b. Fay's failure to act with reasonable diligence in handling the modification applications, giving of contradictory information about why their modifications were denied, failure to correctly analyze their modification applications, sending bills with wildly varying amounts owed and interest rates that were not explained, and other actions as alleged herein violate section 224.77(1)(i), Wis. Stats.

c. Fay's failure to act with reasonable diligence in handling the modifications, failure to comply with federal time limits on responding to modifications, violates sections 224.77(1)(k) and (L), Wis. Stats.

d. Fay's actions as alleged herein violate section 224.77(1)(m), Wis. Stats.

90. The Dellises are aggrieved by the foregoing in that they have suffered damages including but not limited to accruing of attorney's fees, late charges on the loan, damage to their credit, loss of equity in the house, loss of tax deductions from inability to pay and claim mortgage interest, and emotional distress from the fear of losing their home, and pursuant to 12 USC 2605 plaintiffs are entitled to an award of actual damages and attorney's fees; alternatively they are entitled to statutory damages plus attorney's fees.

### **Claim For Punitive Damages:**

91. Reallege and incorporate the foregoing as though set forth fully at this point.

92. Fay's conduct including the belligerent, hostile and demeaning treatment by its employees demonstrates actual malicious actions towards the Dellises; upon information and belief the Fay employees charged with acting on the Dellises' applications acted the way they did out of malice towards the Dellises.

14

93. Fay's method of operations is such that its conduct is substantially certain to result in violations of state and federal law governing loan servicers, as alleged herein, and thus Fay's actions are done with an intentional disregard of plaintiffs' rights to have their modification applications handled in accord with RESPA and their rights to avoid improper conduct under Wisconsin law.

94. As a direct and proximate result of all the foregoing the plaintiffs are entitled to an award of punitive damages.

**PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL ISSUES IN THIS ACTION.**

Dated: June 5, 2018.				**Lawton & Cates, S.C.**
						Attorney for Plaintiffs,
						Joshua & Jessica Dellis

						_____/s/ Briane Pagel_____
						Attorney Briane F. Pagel
						State Bar No: 1025514

P.O. Address:
345 W. Washington Ave., #201
P.O. Box 2965
Madison, WI 53703
P: 608.282.6200
F: 608.282.6252
bpagel@lawtoncates.com

15

Case 1:18-cv-00202-WCG   Filed 06/05/18   Page 15 of 15   Document 12