JOSHUA DELLIS and
JESSICA DELLIS,

        Plaintiffs,

  v.                                    Case No. 18-C-202

FAY SERVICING, LLC,

        Defendant.

## DECISION AND ORDER GRANTING
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Joshua and Jessica Dellis sued Fay Servicing, LLC, for damages allegedly arising out of Fay's servicing of Plaintiffs' home loan and handling of their loan modification applications. The loan was secured by a mortgage on the Dellises' home, and when the Dellises failed to make the payments as they became due, Juniper Reo, the successor holder of the note, commenced a foreclosure action in the Circuit Court for Kewaunee County on January 15, 2015. Dkt. No. 35-1. In response to Juniper Reo's motion for summary judgment in the foreclosure action, the Dellises did not dispute that they were in default on the loan, but argued that Fay, with whom Juniper Reo had contracted to service the loan, had deceived and frustrated their efforts to obtain a modification of the loan in violation of state and federal law. The Circuit Court concluded that the Dellises had raised factual disputes concerning Fay's servicing of the loan that precluded summary judgment in Juniper Reo's favor. The foreclosure action was later dismissed without prejudice on September 6, 2016, shortly after the Dellises' loan was modified. The Dellises then commenced this action on February 7, 2018, alleging violations of the Real Estate Settlement Procedures Act (RESPA),

intentional interference with contract, several violations of Wis. Stat. § 224.77, and intentional interference with contract. Fay filed a motion for partial dismissal in response to Plaintiffs' first amended complaint, which the court granted, dismissing Plaintiffs' intentional interference with contract claim and their claim under § 224.77(1)(c), leaving their RESPA claim and their other § 224.77 claims. Currently before the court is Fay's motion for summary judgment on the remaining claims. The court has jurisdiction over Plaintiffs' RESPA claims under 28 U.S.C. § 1331, and supplemental jurisdiction over their remaining state law claims under 28 U.S.C. § 1367. For the reasons that follow, Fay's motion will be granted with respect to Plaintiffs' RESPA claims, the remaining state law claims will be dismissed without prejudice, and the case will be dismissed.

## BACKGROUND

On May 31, 2007, Joshua Dellis borrowed $72,900 from First Funding Group, LLC. He executed a promissory note to First Funding Group, LLC, and he and his wife granted First Funding Group a mortgage on their home to secure the debt. The loan was initially serviced by Citi Mortgage, Inc. Mr. Dellis, who ran his own construction business, had run into financial difficulties and, along with his wife, had filed for bankruptcy in 2011. They fell behind on their mortgage in early 2013. Dkt. No. 32-1 at 29–33. At or around that time, Mr. Dellis applied for a loan modification from Citi Mortgage.

Fay began servicing the loan in May of 2013. In June, Mr. Dellis contacted Fay to discuss the possibility of loan modification, and Fay advised him to complete the loss mitigation package that it had sent him. From July to December of 2013, Fay and Mr. Dellis were in communication about the loss mitigation application and the need for Mr. Dellis to submit documents that were

required in order for his application to be complete, such as bank statements, his wife's paycheck stubs, and profit and loss statements for his construction business.

On January 10, 2014, Mr. Dellis called Fay and claimed he had sent the requested documents via Federal Express. When Fay went on Federal Express' website and entered the tracking number Mr. Dellis had provided, however, the website indicated that no shipment had been sent or received using that tracking number. On January 22, 2014, after Mr. Dellis gave it the correct tracking number, Fay informed Mr. Dellis that it had received his documents on December 16, 2013, but that several items were missing, including current pay stubs for Mrs. Dellis, current profit and loss statements for his business, and bank statements for both his personal and business accounts. On February 17, 2014, Mr. Dellis called Fay and stated he had recently purchased a new computer and would try to send all of the documents that day.

On March 20, 2014, Fay called Mr. Dellis and informed him that it had received all the documentation it required and that his application was under review. Later that month, Mr. Dellis was approved for a six-month forbearance plan under which Fay agreed to forebear any action on the Dellises previous default while they made regular payments to show their willingness and ability to pay off the loan. The plan was executed in April. The parties dispute what was to happen at the end of the six-month period. Plaintiffs contend a Fay employee told them that if they supplied all the necessary paperwork by July of 2014, Fay would offer them a final modification before the end of the six-month period. Fay asserts it informed Plaintiffs that upon completion of the forbearance plan, it would review their application for a permanent modification, but that an offer was not guaranteed. The recordings of the telephone conversations between Mr. Dellis and Fay representatives largely support Fay's version of events. Indeed, several of these conversations

3

which were played for Mr. Dellis at his deposition appear to contradict many of the allegations of his amended complaint, raising serious concerns over counsel's compliance with Fed. R. Civ. P. 11(b). *See* Dkt. No. 32-1 at 57–141.

At the end of the six-month forbearance period, Fay called Mr. Dellis to inform him that it required updated records and documentation in order to grant a permanent modification in September of 2014. In a telephone conversation on September 22, 2014, Mr. Dellis acknowledged to Fay account representative Neal Hogberg, who had taken over the Dellises' account in May, that he would send Hogberg his wife's last two pay stubs, bank statements for the last two months, and his quarterly profit and loss statements for his business. *Id.* at 61–63. In the course of the conversation, Hogberg patiently explained to Mr. Dellis that before a loan modification agreement could be finalized, he would need to update their financial information by providing the requested documentation. *Id.* at 70–75. Mr. Dellis complimented Hogberg on how helpful he was in comparison with the previous account representative and agreed to provide the requested documentation. *Id.* at 74–76.

In October, Fay again contacted Mr. Dellis in an effort to obtain the documentation it needed to offer him a loan modification. Hogberg was on vacation at the time, but had requested an associate to follow up with Mr. Dellis when the requested documentation did not arrive. *Id.* at 77–78. Mr. Dellis acknowledged that the documentation had not been sent. He stated that his wife tried to email it to Hogberg "a couple times," but was having problems. *Id.* at 79. He stated she would either send it by email that Friday or they would send it by Federal Express. *Id.* at 85–86. In the course of the conversation, Mr. Dellis also commented on how helpful Hogberg had been to him. *Id.* at 81–83. The representative advised Mr. Dellis that the sooner he provided the

documentation the faster they could offer an agreement, and told him to call if he sent it via Federal Express so they could watch for it. *Id.* at 85–86. Hogberg called Mr. Dellis when he returned from vacation on October 23, letting him know he still needed the last two months of Mr. Dellis' bank statements and his last quarter profit and loss statement. *Id.* at 87–90. Hogberg again explained to Mr. Dellis that "the sooner we can get that, then the sooner we can get everything set up so we can do – get this modification just not temporary but permanent." *Id.* at 90. Mr. Dellis emailed Hogberg his July, August, and September bank statements, his profit and loss statement, and his wife's two most recent paycheck stubs on October 30, 2014. *Id.* at 92. On October 31, 2014, Hogberg telephoned Mr. Dellis to let him know that he had not received the banking information in time to be able to offer a permanent agreement. Hogberg had earlier sent Dellis an agreement to extend the forbearance agreement by three months so they would have the time needed to complete the loan modification. He asked Mr. Dellis to sign and fax a copy to him and then send the original in the self addressed Federal Express envelope as soon as possible. *Id.* at 95, 97–99. Hogberg explained that he needed the agreement signed and returned immediately so that they wouldn't have to restart the process, and Mr. Dellis agreed that he would do so.

On November 17, 2014, Mr. Dellis telephoned Hogberg "to touch base" and stated he had sent the signed three-month extension of the forbearance agreement and a check for the monthly payment due under the agreement on November 1, 2014. Dellis initially claimed he had sent it via Federal Express but when Hogberg explained they had not received it, he explained that he sent it out by mail because there was no return envelope. Hogberg said he would look some more. *Id.* at 110–11, 113–17. Mr. Dellis called back the following week on November 2, 2014, and explained that his wife had canceled the check he claimed to have sent on November 1 because they had

5

closed their accounts after $1,300 had been withdrawn by an identity thief. When Hogberg explained that he had still not received the signed forbearance extension or the now canceled check in the mail, Mr. Dellis stated he would sign the copy they had and send that to him, along with a new check for the monthly payment. Hogberg instructed Mr. Dellis that he should also send a copy of the canceled check and a written explanation of what had happened so he could document the fact that it was not his fault that it was not returned within the time required. Mr. Dellis agreed he would do so. *Id.* at 119–24.

Mr. Dellis did not send Hogberg the signed agreement, a new check, the cancelled check, or the written explanation. On December 3, 2014, Hogberg called Mr. Dellis and left a message for him to call him back. *Id.* at 128–29. Mr. Dellis returned the call on December 8, 2014, and asked if he could make a lump sum payment for November and December. Hogberg explained that because he had not received the signed forbearance extension, the canceled check, and payments had stopped, the foreclosure process had restarted. Mr. Dellis acknowledged his own responsibility, stating several times, "it's on my end. I drug my feet too long here with this and that's why I'm calling today." Mr. Dellis asked if he could send "this stuff to you", but Hogberg told him he would have to find out if they would have to start the process over again. *Id.* at 130–34.

Later that same day, Fay called Mr. Dellis back and told him they would send him a new loan modification application and stressed the importance of getting all of the required documents together and returned to Fay in a timely manner. Three weeks later, on December 29, 2014, Fay called Mr. Dellis to inquire about the application. Mr. Dellis stated he did not receive it, so Fay sent him another application.

6

In January 2015, Fay sent the Dellises a new application for loss mitigation. *Id.* at 146. On February 18, 2015, Fay received the Dellises' new loan modification application and began reviewing it. On February 20, 2015, Fay informed Mr. Dellis the application was incomplete and advised him that it needed the information called for by the application by March 20, 2015. On March 17, 2015, Hogberg called Mr. Dellis advising him of the documentation that was still needed to complete his application, including October and January bank statements, the signed profit and loss statement for his business, a 2013 tax return for his business, a written explanation of hardship, and a budget analysis that Hogberg would conduct over the phone. Mr. Dellis acknowledged that he was in the process of gathering the requested documentation and agreed to call Hogberg back the following day to complete the budget analysis. Id. at 156–59. Mr. Dellis apparently did not call Hogberg back the following day, but on March 24, 2015, Hogberg called him. At that time, Mr. Dellis stated his wife had sent out the requested documentation. Hogberg then conducted the budget analysis. *Id.* at 163–78.

On April 8, 2015, Fay called Mr. Dellis and informed him that it still needed a signed and dated year-to-date profit and loss statement for his business to evaluate his loan modification application. On April 27, 2015, Fay called Mr. Dellis and again told him it needed his signed and dated year-to-date profit and loss statement. The following day, Fay received an unsigned copy of the requested statement. Fay called Mr. Dellis and informed him it needed a signed and dated copy of the statement on April 29, 2015, and on May 6, 2015, Fay finally received the signed and dated copy.

On May 7, 2015, Fay notified Mr. Dellis his application was complete and under review. On May 26, 2015, Fay approved the application for a loan modification and sent Mr. Dellis a six-

7

month trial period plan. Upon successful completion of the trial period plan, Mr. Dellis was told his loan would be permanently modified with a fixed interest rate and lowered monthly principal and interest payments. When Fay did not receive the signed agreement, it called Mr. Dellis back on June 5, 2015, at which time, Mr. Dellis advised Fay that he was rejecting Fay's offer and would file suit against Fay instead.

On February 22, 2016, Mr. Dellis contacted Fay and Fay sent him another loss mitigation application later that day. Fay sent Mr. Dellis a notice that his loan modification application was complete and under review on April 14, 2016. Fay approved Mr. Dellis for a loan modification on April 27, and mailed him a copy of the three-month trial period plan. Following completion of the trial period plan, Fay offered Mr. Dellis a permanent loan modification on August 16, 2016, that he accepted. On February 7, 2018, Plaintiffs filed this lawsuit against Fay.

## LEGAL STANDARD

Summary judgment should be granted when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the time and expense of the parties and the court should not be wasted on a trial when there are no material facts in dispute, one party is entitled to judgment on those facts, and thus there is nothing to try. In deciding a motion for summary judgment, all reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some

metaphysical doubt as to the material facts." *Id.* "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non moving party." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

RESPA was enacted "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). The statute applies to "federally related mortgage loan[s]," a term that includes loans secured by a lien on residential real estate "designated principally for the occupancy of from one to four families," for which the lender is federally regulated or has deposits or accounts insured by the federal government. 12 U.S.C. § 2602(1)(A), (B).

In 2010, RESPA was amended pursuant to the Dodd–Frank Wall Street Reform and Consumer Protection Act (the "Dodd–Frank Act" or the "Act"), Pub. L. No. 111–203, 124 Stat. 1376 (2010). Among other provisions, Section 1463 of the Dodd–Frank Act added certain sections to RESPA that, generally speaking, addressed the duties of servicers of federally-related mortgage

9

loans with regard to responding to borrower requests for information or assertions of error. In addition, the Act created the Consumer Financial Protection Bureau (CFPB), which was tasked with prescribing rules and regulations, as well as interpretations, "as may be necessary to achieve" RESPA's purpose. 12 U.S.C. § 2617(a). One such implementing regulation, the Mortgage Servicing Rules (or Regulation X), was repromulgated by the CFPB in 2013 and became effective on January 10, 2014. *See* Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X) (hereinafter, "Mortgage Servicing Rules"), 78 Fed. Reg. 10696–899 (February 14, 2013) (codified at 12 C.F.R. pt. 1024).

Plaintiffs' allegations that Fay violated RESPA under 12 U.S.C. § 2605 are premised entirely on Regulation X, 12 C.F.R. § 1024.41[1]—a regulation prescribed by the CFPB that places various obligations on mortgage servicers when a borrower submits a loss mitigation application. *See generally* 12 C.F.R. § 1024.41. As relevant here, at least insofar as the court can determine from Plaintiffs' opposition to Fay's motion for summary judgment, Regulation X requires that a loan servicer "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application," 12 C.F.R. § 1024.41(b)(1); "[n]otify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete," § 1024.41(b)(2)(i)(B); "[e]valuate the borrower for all loss mitigation options available to the borrower" within thirty days of a complete loss mitigation application, § 1024.41(c)(1)(i); prohibit

---

[1] All references to 12 C.F.R. § 1024.41 are to the version of the regulation that was in effect from January 10, 2014, to October 18, 2017.

filing a foreclosure action until the previously filed loss mitigation application is completed or rejected by borrower, § 1024.41(f)(2); and comply with time requirements for an application filed under a previous servicer upon transfer to a new servicer, § 1024.41(k)(1)(i). Plaintiffs' state law claims are based on alleged violations of subsections (i), (k), (L), and (m) of Wis. Stat. § 224.77.

**A.    RESPA Claims**

As an initial matter, Fay contends that Mrs. Dellis does not have standing to bring claims under RESPA because only borrowers may bring a claim under RESPA and Mrs. Dellis is neither a signatory to the Promissory Note nor the Modification Agreement. As Plaintiffs concede this point, Pls.' Resp. Br., Dkt. No. 33 at 14, Fay's motion for summary judgment is granted as to Mrs. Dellis on any alleged RESPA claims.

Turning to Mr. Dellis, Fay contends that any alleged violation of RESPA that occurred before February 7, 2015, is barred by the statute's three-year statute of limitations. Pursuant to 12 U.S.C. § 2614, actions must be brought "within 3 years in the case of a violation of section 2605." Since this lawsuit was filed on February 7, 2018, any allegations based on pre-February 7, 2015 events would be barred by the statute of limitations.

Plaintiffs' contention that Fay's pre-February 7, 2015 actions are not time barred under the continuing violation doctrine misconstrues the nature of the violations alleged. The continuing violation doctrine is a defense to the statute of limitations that "provides that when a single act gives rise to continuing injuries or when a series of acts gives rise to a cumulative injury, a plaintiff can reach back to the beginning even if it is outside the statute of limitations." *Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1086 (E.D. Wis. 2014) (citing *Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001)). "The continuing violation doctrine, however, does not apply to 'a series

11

of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing,'" *Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir.2010) (quoting *Rodrique v. Olin Emps. Credit Union*, 406 F.3d 434, 443 (7th Cir. 2005)), or "to situations in which there is a single act with lingering effects." *Starsurgical*, 40 F. Supp. 3d at 1086. The doctrine is not "about a continuing, but about a cumulative, violation," allowing suit to be delayed "until a series of wrongful acts blossoms into an injury on which suit can be brought." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008). "The purpose of the continuing violation doctrine is not to reset the statute of limitations every time an individual act occurs." *Lockhart v. HSBC Fin. Corp.*, No. 13 C 9323, 2014 WL 3811002, at *10 (N.D. Ill. Aug. 1, 2014). The violations alleged by Plaintiffs for violations of 12 C.F.R. § 1024.41 during the course of the loan modification effort, *see* Pls.' Resp. Br., Dkt. No. 33 at 3–8, pertain to individual acts—each of which are individually actionable occurrences rather than a part of one long continuous act that culminated in a single violation of the regulation. Plaintiffs' reliance on *Ebner v. Bank of Nova Scotia*, No. 1:18-v-00002, 2019 WL 404969 (D.V.I. Jan. 21, 2019), is misplaced, as the court there was not addressing violation of Regulation X, but rather violations of § 2605(g). More importantly, the court found that the continuing violation did not apply to the plaintiff's claim because the allegations described "continued ill-effects rather than continuing violations." *Id.* at *5. Thus, any alleged violations caused by Fay's actions that occurred before February 7, 2015, are barred by the three-year statute of limitations.

The effective date of Regulation X, 12 C.F.R. § 1024.41, and its lack of retroactive application, further narrows the scope of Plaintiffs' actionable RESPA claims. All of Plaintiffs' claims under § 2605 stem from alleged violations of Regulation X. Resp. Br., Dkt. No. 33 at 3

("Although suing under RESPA, the Dellises are asserting violations of a federal regulation actionable under that law."). Regulation X did not go into effect until January 10, 2014. Amendments to the 2013 Mortgage Rules Under the Equal Credit Opportunity Act (Regulation B), Real Estate Settlement Procedures Act (Regulation X), and the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 60382-01 (Oct. 1, 2013) (codified at 12 C.F.R. § 1024) (hereinafter, 2013 Amendments) ("This final rule is effective January 10, 2014."). Courts that have addressed Regulation X's applicability to loss mitigation applications submitted before January 10, 2014, that were evaluated and reviewed after that date have found "that an application received by a servicer prior to the Effective Date does not activate the requirements under Regulation X." *Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp. 3d 1172, 1185 (S.D. Fla. 2015), *aff'd*, 839 F.3d 1003 (11th Cir. 2016); *accord Searcy v. CitiMortgage, Inc.*, 733 F. App'x 735, 738 (5th Cir. 2018) ("The relevant RESPA provisions went into effect on January 10, 2014, and do not apply retroactively. This means that in order to avail themselves of these protections, [the servicer] would have needed to receive the [borrower's] application on or after January 10.") (internal citations omitted); *Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 297 (6th Cir. 2015) ("For many of these Title XIV Final Rules, the CFPB specified that 'the new regulations would apply to *transactions for which applications were received on or after January 10, 2014*,' expressly disclaiming any retroactive application of the rules.") (emphasis in original) (citing 78 Fed. Reg. 60382-01 at 60385). This conclusion is also supported by amendments made to Regulation X in October of 2013, *see* 2013 Amendments ("[T]he new regulations would apply to transactions for which applications were received on or after January 10, 2014."), as well as the consumer advice report published by the CFPB shortly after Regulation X's implementation. *See* CFPB, *Help for Struggling Borrowers: A*

*guide to the mortgage servicing rules effective on January 10, 2014* (January 28, 2014) (available at https://files.consumerfinance.gov/f/201402_cfpb_mortgages_help-for-struggling-borrowers.pdf) (last visited June 10, 2019) ("The loss mitigation application rules only apply to loss mitigation applications submitted on or after January 10, 2014."). Accordingly, Regulation X did not apply to Plaintiffs' first loan mitigation application as it was submitted in June of 2013, prior to January 10, 2014.

This leaves Plaintiffs' second and third loan mitigation application. Regarding the third application submitted around April of 2016, pursuant to Regulation X, "[a] servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's mortgage loan account." 12 C.F.R. § 1024.41(i). Because Plaintiffs' second loss mitigation application was subject to the requirements of Regulation X, Fay was under no duty to comply with Regulation X's requirements in regards to Plaintiffs' third application. Nor do Plaintiffs allege any violations in conjunction with the third loss mitigation application.

Regarding Mr. Dellis' second application, which was submitted on February 18, 2015, approved by Fay on May 26, 2015, and ultimately rejected by Plaintiffs on June 5, 2015, Plaintiffs cannot establish a violation of Regulation X. Fay notified Mr. Dellis on February 20, 2015—two days after receiving his application—that it was incomplete because it was missing his last two months of banking statements, signed year-to-date profit and loss statements for his business, personal and business tax returns from 2013, and a hardship explanation, satisfying the requirements of 12 C.F.R. § 1024.41(b)(2)(i)(B).[2] Fay also notified Mr. Dellis within five business days that his

---

[2] 12 C.F.R. § 1024.41(b)(2)(i)(B) requires that a servicer:

Notify the borrower in writing within 5 days (excluding legal public holidays,

14

loss mitigation application was complete and under review in compliance with § 1024.41(b)(2)(i)(B), and evaluated, reviewed, and approved his application within 30 days in compliance with § 1024.41(c)(1). Although Plaintiffs assert that Fay did not comply with Regulation X because it contacted Mr. Dellis by phone on March 24, April 8, April 27, and April 29 regarding missing documents he needed to submit in order to complete his application and did not provide written notice regarding the missing documents, Fay did notify Mr. Dellis within five days of receiving his application that it was incomplete, as required, and it does not appear, nor do Plaintiffs cite, a specific provision of Regulation X that requires a servicer to provide written notice to a borrower each time the borrower submits some but not all additional information identified in the initial written notification regarding the borrower's application. *See* § 1024.41(b)(2)(i)–(ii), (c)(2)(i)–(iv). Even if the statute does require written notification in those circumstances, 12 U.S.C. § 2605 "does not grant statutory damages for bare procedural violations; it requires an actual injury," *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016), and Plaintiffs have not established that Fay's actions, calling instead of providing written notice regarding the documents it still required to assess Mr. Dellis' application, caused their injury. Thus, even if Fay was required to provide written notice regarding the documents identified by Fay in its initial written notice to Mr. Dellis after he submitted his application that he still needed to submit,

> Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (b)(2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options.

15

summary judgment in favor of Fay would still be appropriate because Plaintiffs have not established that Fay's failure to do so caused their alleged injuries. *See id.* at 591 (affirming district court's decision granting summary judgment in favor of servicer where the borrower failed to "allege enough to demonstrate, not just that [the servicer] was responsible for [the plaintiff's alleged injuries], but specifically, that [the servicer's] failures to comply with RESPA . . . caused their injury").

Plaintiffs' assertion that the first loan modification application did not conclude until June of 2015 does not change the result. Treating the new loan modification application submitted in February of 2015 as just a continuation of the original loan modification application initiated in June of 2013 would make Regulation X, upon which Plaintiffs' claims are based, inapplicable. If the February 2015 application was a continuation of the initial June 2013 application, Regulation X would not apply because, as already noted, Regulation X was not effective under January 10, 2014, and does not apply to applications pending at the time of its effective date. Because the undisputed facts do not establish that Fay violated Regulation X, and thus did not violate 12 U.S.C. § 2605, Fay's motion for summary judgment is granted with respect to Plaintiffs' RESPA claims.

**B.     Wisconsin Statute § 224.77**

Fay asserts that its actions in relation to its servicing of Plaintiffs' loan did not violate Wis. Stat. § 224.77. Plaintiffs contend that Fay's actions demonstrated "a lack of competency" in violation of § 224.77(1)(i), violated a federal regulation that relates to practice as a mortgage banker in violation of § 224.77(1)(k), and engaged in conduct that "constitutes improper, fraudulent, or dishonest dealing" in violation of § 224.77(1)(m). Plaintiffs state, however, that they are no longer pursuing a claim under § 224.77(1)(L). Pls.' Resp. Br., Dkt. No. 33 at 10 n.5.

Having determined that Plaintiffs' federal claim should be dismissed on summary judgment, the court will decline to exercise jurisdiction over their remaining state law claims. "A federal court's decision to exercise supplemental jurisdiction over state law claims is discretionary." *Coleman v. City of Peoria, Illinois*, No. 18-1742, 2019 WL 2240575, at *12 (7th Cir. May 24, 2019). "Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Id.* As all of Plaintiffs' claims within the court's original jurisdiction have been dismissed, Plaintiffs' state law claims for violations of Wis. Stat. § 224.77 are dismissed without prejudice for lack of federal jurisdiction.

## CONCLUSION

For the foregoing reasons, Fay's motion for summary judgment (Dkt. No. 30) is **GRANTED** with respect to Plaintiffs' federal claims and the Clerk is directed to enter judgment in favor of Fay, dismissing Plaintiffs' federal claims with prejudice. The court declines to exercise jurisdiction over Plaintiffs' remaining state law claims, and they are **DISMISSED without prejudice**.

**SO ORDERED** this  21st  day of June, 2019.

> s/ William C. Griesbach
> William C. Griesbach, Chief Judge
> United States District Court